<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COFUND II LLC,<br><br>      Plaintiff,<br><br>v.<br><br>HITACHI CAPITAL AMERICA CORP.,<br><br>      Defendant. | Case No. 16-cv-1790 (SDW) (LDW)<br><br>**TRIAL OPINION**<br><br>February 22, 2021 |

**WIGENTON**, District Judge.

   This Court held a bench trial for three days in this matter regarding Plaintiff CoFund II LLC's ("Plaintiff" or "CoFund") breach of contract claim against Defendant Hitachi Capital America Corp. ("Defendant"). This Court has jurisdiction pursuant to 28 U.S.C § 1332 and venue is proper pursuant to 28 U.S.C. § 1391. Based on the testimony and evidence presented at trial, this Trial Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Rule") 52(a). For the reasons stated below, this Court finds that Defendant is liable to Plaintiff for breach of contract.

**I.**  <u>**PROCEDURAL HISTORY**</u>

   Plaintiff brought this action on March 31, 2016, claiming that Defendant is liable for breach of contract (Count I), breach of fiduciary duty (Count II), tortious interference (Count III), conversion (Count IV), and unjust enrichment (Count V). (D.E. 1.) On November 7, 2016, this Court denied Defendant's Motion to Dismiss or Stay this action in favor of non-party Forest

Capital, LLC's ("Forest") earlier-filed bankruptcy proceeding in the United States Bankruptcy Court for the District of Maryland. (*See* D.E. 11, 20, 21.) Following Defendant's Motion for Summary Judgment, this Court dismissed Counts II – V. (*See* D.E. 83, 90, 91.) This Court held a virtual bench trial on Count I on November 10–12, 2020, and the parties subsequently submitted post-trial briefs with proposed findings of fact and conclusions of law. (D.E. 130–32, 138, 139.)

## II.   FINDINGS OF FACT

This Court, writing primarily for the parties, makes the following findings of fact:

### A.   The Governing Contracts

Plaintiff entered into a Master Participation Agreement ("MPA," Exs. P-1 and D-3)[1] with Forest on January 12, 2012. Under the agreement, Plaintiff purchased participations in factoring[2] transactions that Forest made with its clients. (*See* MPA § 2.) The amounts of Plaintiff's participations for particular factoring transactions (*i.e.*, its "pro rata" interests in those transactions) are set forth in 24 separate Participation Offer and Acceptance Forms that were signed by Plaintiff and Forest between January 2012 and September 2015. (Exs. P-3 to P-26; *see* Ex. P-27 at CoFund-2653 – CoFund-2667 (tracking Plaintiff's monthly outstanding participation amounts, advances, and repayments, for each Forest client from January 2012 to December 2015).)

In return for purchasing participations in the factoring transactions, Forest granted Plaintiff a first-priority security interest in the collateral relating to each factoring transaction to the extent of Plaintiff's pro rata interest in those transactions. (MPA § 5.) However, Plaintiff's interest in any factoring transaction was limited to 50% of the total funds employed in the client account,

---

[1] References to trial exhibits are to P-1, *et seq.*, for Plaintiff's exhibits and to D-1, *et seq.*, for Defendant's exhibits. References to trial transcripts identify the witness, volume ("TI", "T2", or "T3"), and page: line.

[2] A factoring transaction is one in which a business sells its accounts receivable (*i.e.*, invoices) to a third party in order to generate cash. (*See* Dahm, T2, 246:13–24.)

regardless of Plaintiff's initial investment. (MPA § 3(a); *see* Dahm, T2, 261:6 – 262:11.)[3] Forest was required to hold any funds in excess of Plaintiff's 50% interest in reserve for Plaintiff to use in future participations. (MPA §§ 3(b) and 3(d); *see* Dahm, T2, 262:12–15.) Plaintiff perfected its security interest in the MPA-defined collateral on January 23, 2012, by filing a UCC financing statement with the Maryland State Department of Assessments and Taxation. (Ex. P-2.)

On December 5, 2014, Defendant entered into its own agreement with Forest to lend money to Forest. (Ex. D-1 (Loan and Security Agreement or "LSA").) Under the LSA, Forest granted Defendant a security interest in a broad swath of collateral, as defined by that agreement, but also gave notice that the collateral may be subject to "Permitted Encumbrances," which the agreement identified as Plaintiff's UCC financing statement filed on January 23, 2012. (LSA §§ 1.26 and 7.7; LSA Ex. A.) On December 16, 2014, Defendant filed its own UCC financing statement with the Maryland State Department of Assessments and Taxation to perfect its security interests in "all assets of Forest now owned or hereafter acquired." (Ex. D-2 (capitalization omitted).)

Plaintiff and Defendant executed an Intercreditor Agreement (Ex. D-4) on December 19, 2014, to determine the priorities of their security interests in the collateral covered by their respective agreements with Forest. Under the agreement, the parties agreed, *inter alia*, that:

> The lien or security interest of any kind that [Plaintiff] may now have or hold in the future with respect to the CoFund Priority Collateral shall be superior to any lien or security interest that [Defendant] may now have or hereafter acquire in the CoFund Priority Collateral . . . .

(Intercreditor Agreement § 2.B.) The agreement defined "CoFund Priority Collateral" as "only those amounts received by [Forest] which represent CoFund's Pro Rata interest in a Transaction

---

[3] Specifically, MPA § 3(a) states that "[CoFund's] Investment in a Transaction as of any Settlement Date shall not exceed fifty percent (50%) of the aggregate principal amount of Advances to the Client then outstanding (Participant's 'Maximum Permitted Investment')." The MPA further defines "Settlement Date" as "the last business day of each month." MPA § 1.

3

as well as CoFund's Pro Rata interest in the tangible and intangible assets and property securing the obligations relating to each Transaction." (Intercreditor Agreement § 1.A.)[4]

The Intercreditor Agreement also provided, in relevant part:

> If . . . any party receives Collateral (including Proceeds) with respect to which it is an Inferior Creditor and there is unpaid [Forest] indebtedness due to the Superior Creditor with respect to such Collateral, the Inferior Creditor receiving such Collateral shall be deemed to have received such Collateral (including Proceeds) for the use and benefit of the Superior Creditor and shall hold it in trust and shall immediately turn it over to the Superior Creditor to be applied upon the indebtedness of [Forest]. . . .
>
> [Defendant] shall hold all funds representing CoFund Priority Collateral in trust for [Plaintiff].

(*Id.* § 4.D.)

Subsequently, on December 29, 2014, Forest, Defendant, and non-party Manufacturers and Traders Trust Company ("M&T") entered into a Blocked Account Agreement ("BAA"). (Ex. P-30.)[5] Under the terms of the LSA and BAA, Forest and/or Forest's clients deposited all moneys that Forest's clients paid/owed to Forest into a blocked M&T account. (LSA § 8.11(a).)[6] Also under the terms of the BAA, Defendant had "sole dominion and control" of the blocked account and Forest was unable to withdraw any moneys from the blocked account to pay Plaintiff. (BAA § 4(b).) Rather, M&T "transfer[red]. . . all available funds on deposit in the Blocked Account to

---

[4] Similarly, the Intercreditor Agreement stated that "[t]he lien or security interest of any kind that [Defendant] may now have or hold in the future with respect to the Hitachi Priority Collateral shall be superior to any lien or security interest that [Plaintiff] may now have or hereafter acquire in Hitachi Priority Collateral." (Intercreditor Agreement § 2.A.) Hitachi Priority Collateral consisted of all of Forest's property except CoFund Priority Collateral. (Intercreditor Agreement § 1.B.)

[5] The BAA was executed pursuant to the LSA. (*See* BAA at 1 ("WHEREAS, pursuant to that certain Loan Agreement, to be entered into on or about December 5, 2014 . . . .").)

[6] LSA § 8.11(a) specifies that Defendant's "dominion of funds," comprising "all payments due [to Forest]" from "all Customers," is a requirement of the loan provided in the LSA. (LSA § 8.11(a) ("The loan shall be on dominion of funds. . . . . [Forest] shall have no right to withdraw any funds from [the blocked account], all of [Forest's] funds therein belong to [Defendant].").) The BAA implements this provision by requiring that "the Blocked Account shall be under the sole dominion and control of [Defendant]." (BAA § 4(b).)

4

the account of [Defendant]." (BAA § 4(a).) This was corroborated by Defendant's sole witness, Toby Dahm, a Senior Vice President at Defendant during the relevant time period. (*See* Dahm, T2, 272:4–7 ("[B]asically all of Forest Capital's inbound cash came into a . . . blocked account. That blocked account then [wa]s swept to Hitachi to pay down its line of credit.").)

By this process, Plaintiff contends, Defendant received Cofund Priority Collateral that Plaintiff is entitled to under the MPA. Defendant has not turned over these funds to Plaintiff, allegedly in breach of the Intercreditor Agreement, which requires Defendant to "hold all funds representing CoFund Priority Collateral in trust for [Plaintiff]." (Intercreditor Agreement § 4.D.)

  **B.**  **Forest's Default and Bankruptcy**

By letter on December 24, 2015, Plaintiff notified Forest and Defendant that Forest was in default under the MPA with respect to its obligations to Plaintiff. (Ex. P-38.) On December 29, 2015, certain Israel-based junior creditors of Forest sent a letter to Forest's then outside counsel, copied to Plaintiff and Defendant, noting their own dispute with Forest and the need to reach a "settlement agreement between all creditors, including the [junior creditors], which will adhere to the different parties' rights and references vis-à-vis Forest Capital and its available assets." (Ex. D-44 at 1; *see* Dahm, T2, 286:1 – 288:1.) The same junior creditors sent another letter in February 2016 reiterating their position. (Ex. D-45 at 1; *see* Dahm, T2, 305:4–17.)

Plaintiff also sent a letter to Defendant on March 21, 2016, requesting an immediate accounting of all collateral Defendant had received from Forest since December 9, 2014, and the immediate turnover of CoFund Priority Collateral. (Ex. P-58.) During this time, Defendant maintained a collateral reserve in Plaintiff's favor to protect any interest Plaintiff may have. (*See* Dahm, T2, 306:20 – 307:7.) Mr. Dahm testified that, after Defendant collected out on its loan to Forest, it released the blocked account along with its collateral reserve for Plaintiff back to Forest.

5

(Dahm, T2, 311:22 – 312:18.) At the time, this collateral reserve amounted to nearly $2 million. (Ex. P-67 at 1.)

On March 24, 2016, certain junior creditors commenced bankruptcy proceedings against Forest. *In re Forest Capital, LLC*, Case No. 16-13850 (D. Md. Bankr.); (*see* Ex. D-11 at 8). Plaintiff was a party to that case. (*See* Goldmeier, T1, 97:6–18.) Plaintiff sued Defendant in this Court shortly thereafter, on March 31, 2016. (D.E. 1.) The bankruptcy court approved the sale of substantially all of Forest's assets on May 31, 2016, including accounts in which Plaintiff had funded participations. (Exs. D-9, D-10, D-11 at 8–11; Goldmeier, T1, 100:17 – 101:18.) Forest commenced an adversary case on July 7, 2016, to determine the existence, validity, and priority of various creditors' rights to the assets of the bankruptcy estate. *Forest Capital, LLC v. Hitachi Cap. Am. Corp.*, Adv. No. 16-326 (D. Md. Bankr.); (*see* Ex. D-11 at 9). The adversary case settled on March 15, 2019, with Plaintiff and Defendant both receiving proceeds. (*See* Ex. D-11 at 12.)

### III. <u>CONCLUSIONS OF LAW</u>

#### A. **Defendant Breached the Intercreditor Agreement**[7]

As this Court held in its summary judgment opinion, the Intercreditor Agreement is governed by Michigan law. (*See* D.E. 90 at 6, 6 n.7.) "Under Michigan law, the elements of a breach of contract claim are the following: (1) a contract existed between the parties, (2) the terms of the contract required performance of certain actions, (3) a party breached the contract, and (4)

---

[7] Defendant asks this Court to revisit its November 17, 2017, decision denying Defendant's motion to dismiss, arguing that Plaintiff's losses were caused by Forest and resolved in Forest's bankruptcy case. (D.E. 139 at 14–15 ¶¶ 1–6.) However, as this Court explained in its original decision, and affirms now, the losses that Plaintiff alleges in this action were caused by Defendant's breach of the Intercreditor Agreement, an issue which was not addressed in the bankruptcy proceeding. (*See* D.E. 20 at 5–6.) As this Court further explained in its decision denying Defendant's motion for summary judgment on Count I, Plaintiff's claim is that Defendant violated an express provision of the Intercreditor Agreement, not that Forest failed to make a payment. (*See* D.E. 90 at 7–8.) To the extent that Forest's failure to make a payment to Plaintiff is the underlying harm that Plaintiff suffered, for the reasons discussed below, such harm only occurred because (1) under the BAA and LSA, Defendant required Forest to deliver funds due to Plaintiff to Defendant instead, and (2) Defendant allegedly breached the Intercreditor Agreement with respect to the use of those funds. This Court will therefore analyze the merits of Plaintiff's claim.

the breach caused the other party injury." *Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007) (citation omitted). Here, Plaintiff claims that Defendant, the Inferior Creditor with respect to CoFund Priority Collateral, violated § 4 of the Intercreditor Agreement when it received funds pursuant to the LSA and BAA but did not turn over those funds to Plaintiff.

The Intercreditor Agreement was a valid and enforceable contract under Michigan law. Whereas Defendant had a security interest against Forest's assets under the LSA, Plaintiff did not loan money to Forest; rather, Plaintiff purchased from Forest a participation interest (*i.e.*, an ownership interest) in certain transactions that Forest made with its clients. As consideration for the purchase, Plaintiff received, not a lien on Forest's assets, but a participation that included "a Pro Rata interest in the underlying Collateral and Financing Documents." (*See* MPA §§ 1 and 2.)

Under the terms of the Intercreditor Agreement, moreover, Defendant was required to "hold all funds representing CoFund Priority Collateral in trust for [Plaintiff]." (Intercreditor Agreement § 4.) Pursuant to the BAA that Defendant, Forest, and M&T entered into shortly after the Intercreditor Agreement was executed, Defendant was entitled to take, and took, "sole dominion and control" over all funds attributable to the repayment of loans made by Forest to its clients, including those loans which were owned in part by Plaintiff through its participations. (*See* BAA § 4(b); Dahm, T2, 272:4–7.) The portion of those funds representing repayment of Plaintiff's participations belonged to Plaintiff, and Defendant had a duty to hold those funds in trust.

Defendant's actions breached the Intercreditor Agreement in multiple respects. First, Defendant "[e]nforce[d]" and "realize[d] []  its security interest in" the Cofund Priority Collateral that had been collected and deposited into the blocked account at M&T, despite being an Inferior Creditor for such collateral, in violation of § 4.A. Second, Defendant interfered with Plaintiff's

7

participation interests by collecting Cofund Priority Collateral in the blocked account and not "promptly release[ing]" it to Plaintiff, in violation of § 4.B.  Third, Defendant "notif[ied] persons" within its organization to "remit" the Cofund Priority Collateral to itself, in violation of § 4.C.

Fourth, Defendant received, and had full control over, 100% of the moneys paid by (or on behalf of) Forest's clients with respect to obligations owed by those clients to Forest.  The moneys, all of which were deposited into the blocked account, included (1) repayment of moneys that had been advanced by Plaintiff for its participation interests, and (2) repayment of moneys that had been advanced by Defendant under its LSA.  To the extent that moneys deposited into the blocked account represented repayment of the moneys that had been advanced by Plaintiff for its participation interests, Plaintiff was the Superior Creditor and Defendant was the Inferior Creditor.  However, contrary to its obligations under § 4.D of the Intercreditor Agreement, Defendant did not "receive[] such Collateral (including Proceeds) for the use and benefit" of Plaintiff, did not "hold it in trust" for Plaintiff, and did not "immediately turn it over" to Plaintiff, to be applied upon Forest's indebtedness to Plaintiff.

**B.     Defendant Did Not Prove Impossibility or Impracticability of Performance**

In the alternative, Defendant argues that it is excused from performance under the Intercreditor Agreement because performance was impossible or impracticable.  Michigan courts have applied the affirmative defenses of impossibility and impracticability interchangeably.  *See Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 702 (6th Cir. 2017).  The defense of impossibility provides that "'when, due to circumstances beyond the control of the parties the performance of a contract is rendered impossible, the party failing to perform is exonerated." *Bissell v. L. W. Edison Co.*, 156 N.W.2d 623, 626 (Mich. Ct. App. 1967) (citation omitted). Although absolute impossibility is not required, there must be a

showing of "impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Id.* (citation omitted).

Defendant contends that it was "impossible" for it to account to Plaintiff because it could not determine what portion of the funds in the blocked account represented amounts attributable to Plaintiff's participations. (D.E. 139 at 23 ¶¶ 26–31.) Defendant argues that the parties relied on Forest to identify the balance of CoFund Priority Collateral, but Forest did a terrible job of this, making it impossible to track and understand what constituted Plaintiff's collateral. (*Id.*) Furthermore, there were other creditors making claims against the same funds as Plaintiff, and Defendant was unable to disaggregate the priorities of the claims. (*Id.*; *see* Exs. D-44 and D-45.) The accounting difficulty was exacerbated because Plaintiff failed to provide adequate information and "lost track of where they were." (Dahm, T2, 290:12 – 291:15.)

However, Defendant did not prove these assertions at trial. That the Israel-based junior creditors claimed an interest in the funds in the blocked account did not render payment of the amounts due to Plaintiff impossible or impracticable. From the beginning, the amounts in the blocked account attributable to Plaintiff's participations were Plaintiff's property—not Forest's—which Defendant was holding in trust. Other creditors could not have had any interest in those moneys. If there was a legitimate concern on the part of Defendant that other creditors might claim some interest in the funds held in trust for Plaintiff, the appropriate action would have been to hold the funds (and, if necessary, to interplead them), instead of disregarding its obligations as a trustee under the Intercreditor Agreement and paying the moneys to itself.

Moreover, Defendant did not raise the issue of impossibility or impracticability of performance at any time before the commencement of this lawsuit. (Goldmeier, T1, 91:14 – 93:3.) In fact, as late as February 11, 2016, Mr. Dahm e-mailed Forest regarding his "methodology to

9

provide some protection against the claims that CoFund is asserting," claiming to "maintain a cushion" of "just under $1 million." (Ex. P-57.) Meanwhile, Defendant had no difficulty reducing its multimillion-dollar loan with Forest to zero between January and March 2016, while at the same time withholding all money from Plaintiff. This Court therefore finds that Defendant's performance under the Intercreditor Agreement was neither impossible nor impracticable.

### C. Plaintiff is Entitled to Damages

#### 1. *Mr. Cohen Was Qualified to Testify*

As an initial matter on the issue of damages, Defendant argues that Daniel Cohen's testimony must be stricken because his opinion did not meet the more demanding requirements of Rule 26(a)(2)(B). Rule 26(a)(2) provides for two separate types of disclosure of expert opinions. If the expert was "one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," then the party must comply with the extensive disclosure requirements set forth in Rule 26(a)(2)(B).[8] Fed. R. Civ. P. 26(a)(2)(B). If the expert was not so retained or employed, Rule 26(a)(2)(C) only requires the party to disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

---

[8] These requirements include:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Here, Mr. Cohen is a managing member of Plaintiff and was not retained or specially employed by Plaintiff to provide expert testimony in the case, nor do his duties as a managing member of Plaintiff regularly involve giving expert testimony. Although Mr. Cohen's testimony partially relied on documents produced in this case, it is clear that "his opinion testimony ar[ose] not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation." *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (citing *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007)). Thus, although Mr. Cohen prepared a written report, his report was not required to contain all of the elements set forth in Rule 26(a)(2)(B), and his testimony will not be excluded.

### 2. Calculation of Damages

Mr. Cohen testified that, in the first three months of 2016, Defendant "collected a little bit over $9.1 million" from the blocked account at M&T Bank. (Cohen, T2, 193:1–16). Of this collected amount, he testified, $1,553,613 represented monies on viable accounts on which Plaintiff was owed $2,119,959 in unpaid participation interest at the end of 2015. (Cohen, T1, 137:16 – 141:12; Cohen, T2, 192:23 – 194:20; Ex. P-67.) Plaintiff argues that it is entitled to this $1,553,613 in damages plus interest. (D.E. 138 at 47 ¶¶ 89–90.)

Defendant contends, based on Mr. Dahm's testimony, that any recovery must be limited by (1) the 50% limitation in the MPA; (2) the limitation to Plaintiff's "pro rata" contribution under the MPA as stated in the Participation Offer and Acceptance Forms; (3) excluding funding for non-factoring transactions such as "security deposits" or "mobilization" loans; (4) excluding accounts that were "improperly collateralized" in September 2015; and (5) excluding proceeds Plaintiff received for identical accounts that were in the Forest bankruptcy. (D.E. 138 at 10–13

¶¶ 48–60.) Applying these limitations and exclusions, Defendant contends that Plaintiff is entitled at most to $606,209 in principal damages. (*Id.* at 11 ¶ 48.)

The parties' proposed findings of fact and conclusions of law on the issue of calculating damages are, at times, unclear, convoluted, or inadequately explained. This Court will therefore request that the parties submit supplemental briefs prior to its final determination of damages. Each party's supplemental brief should be no more than ten (10) pages double-spaced, *clearly* and *concisely* setting forth the bases of its proposed damages calculation, including the legal and factual support for its proposed inclusions, exclusions, and limitations, based on the record at trial.

## IV.     CONCLUSION

For the reasons set forth above, this Court finds in favor of Plaintiff regarding liability for its breach of contract claim. The parties shall have fifteen (15) days to submit supplemental briefs on the issue of damages only, as set forth above. An appropriate order follows.

s/ *Susan D. Wigenton*<br>
**SUSAN D. WIGENTON**<br>
**UNITED STATES DISTRICT JUDGE**

Orig:     Clerk
cc:       Hon. Leda D. Wettre, U.S.M.J.
          Parties