NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| COFUND II LLC,<br><br>                Plaintiff,<br><br>v.<br><br>HITACHI CAPITAL AMERICA CORP.,<br><br>                Defendant. | Case No. 16-cv-1790 (SDW) (LDW)<br><br>**SUPPLEMENTAL TRIAL OPINION**<br><br>May 4, 2021 |

**WIGENTON**, District Judge.

This Court held a bench trial in this matter regarding Plaintiff CoFund II LLC's ("Plaintiff" or "CoFund") breach of contract claim against Defendant Hitachi Capital America Corp. ("Defendant"). Based on the testimony and evidence presented at trial, this Court entered its Trial Opinion on February 22, 2021, finding Defendant liable to Plaintiff for breach of contract. (D.E. 143 ("Trial Op.").)[1] In its Trial Opinion, this Court asked the parties to submit supplemental briefs on the issue of damages only, which the parties timely filed. (*Id.* at 12; D.E. 145, 146.) Pursuant to Federal Rule of Civil Procedure 52,[2] this Opinion constitutes the Court's supplemental findings of fact and conclusions of law on the issue of damages. For the reasons stated below, this Court finds Defendant liable to Plaintiff in the amount of $1,553,613 plus interest and costs.

I.     **BACKGROUND**

In its Trial Opinion, this Court summarized the procedural history of this matter, made Findings of Fact and Conclusions of Law on the issue of liability, and addressed the admissibility

---

[1] *CoFund II LLC v. Hitachi Cap. Am. Corp.*, Civ. No. 16-1790, 2021 WL 689119 (D.N.J. Feb. 22, 2021).

[2] This Court has jurisdiction pursuant to 28 U.S.C § 1332 and venue is proper pursuant to 28 U.S.C. § 1391.

of certain witness testimony. (*See* Trial Op. at 1–11.) This Court, writing primarily for the parties, briefly summarizes the previous Findings of Fact and Conclusions of Law only to the extent necessary to address the issue of damages.

Plaintiff entered into a Master Participation Agreement ("MPA," Exs. P-1 and D-3)[3] with non-party Forest Capital, LLC ("Forest") on January 12, 2012. Under the agreement, Plaintiff purchased participations in factoring transactions that Forest made with its clients. (*See* MPA § 2.)[4] In return for purchasing participations in the factoring transactions, Forest granted Plaintiff a first-priority security interest in the collateral relating to each factoring transaction to the extent of Plaintiff's pro rata interest in those transactions. (MPA § 5.) However, Plaintiff's interest in any factoring transaction was limited to 50% of the total funds employed in the client account, regardless of Plaintiff's initial investment. (MPA § 3(a); *see* Dahm, T2, 261:6 – 262:11.)[5] Forest was required to hold any funds in excess of Plaintiff's 50% interest in reserve ("Reserve Funds") for Plaintiff to use in future participations. (MPA §§ 3(b) and 3(d); *see* Dahm, T2, 262:12–15.)

On December 5, 2014, Defendant entered into its own agreement with Forest to lend money to Forest. (Ex. D-1 (Loan and Security Agreement or "LSA").) Under the LSA, Forest granted Defendant a security interest in a broad swath of collateral, as defined by that agreement, but also gave notice that the collateral may be subject to "Permitted Encumbrances," which the agreement

---

[3] References to trial exhibits are to P-1, *et seq.*, for Plaintiff's exhibits and to D-1, *et seq.*, for Defendant's exhibits. References to trial transcripts identify the witness, volume ("TI", "T2", or "T3"), and page: line.

[4] The amounts of Plaintiff's participations for particular factoring transactions (*i.e.*, its "pro rata" interests in those transactions) are set forth in 24 separate Participation Offer and Acceptance Forms that were signed by Plaintiff and Forest between January 2012 and September 2015. (Exs. P-3 to P-26; *see* Ex. P-27 at CoFund-2653 – CoFund-2667 (tracking Plaintiff's monthly outstanding participation amounts, advances, and repayments for each Forest client from January 2012 to December 2015).)

[5] Specifically, MPA § 3(a) states that "[CoFund's] Investment in a Transaction as of any Settlement Date shall not exceed fifty percent (50%) of the aggregate principal amount of Advances to the Client then outstanding (Participant's 'Maximum Permitted Investment')." The MPA further defines "Settlement Date" as "the last business day of each month." MPA § 1.

identified as Plaintiff's UCC financing statement filed on January 23, 2012. (LSA §§ 1.26 and 7.7; LSA Ex. A.)

Plaintiff and Defendant executed an Intercreditor Agreement (Ex. D-4) on December 19, 2014, to determine the priorities of their security interests in the collateral covered by their respective agreements with Forest. Under the agreement, the parties agreed, *inter alia*, that:

> The lien or security interest of any kind that [Plaintiff] may now have or hold in the future with respect to the CoFund Priority Collateral shall be superior to any lien or security interest that [Defendant] may now have or hereafter acquire in the CoFund Priority Collateral . . . .

(Intercreditor Agreement § 2.B.) The agreement defined "CoFund Priority Collateral" as "only those amounts received by [Forest] which represent CoFund's Pro Rata interest in a Transaction as well as CoFund's Pro Rata interest in the tangible and intangible assets and property securing the obligations relating to each Transaction." (Intercreditor Agreement § 1.A.)

The Intercreditor Agreement also provided, in relevant part:

> If . . . any party receives Collateral (including Proceeds) with respect to which it is an Inferior Creditor and there is unpaid [Forest] indebtedness due to the Superior Creditor with respect to such Collateral, the Inferior Creditor receiving such Collateral shall be deemed to have received such Collateral (including Proceeds) for the use and benefit of the Superior Creditor and shall hold it in trust and shall immediately turn it over to the Superior Creditor to be applied upon the indebtedness of [Forest]. . . .
>
> [Defendant] shall hold all funds representing CoFund Priority Collateral in trust for [Plaintiff].

(*Id.* § 4.D.)

Subsequently, on December 29, 2014, Forest, Defendant, and non-party Manufacturers and Traders Trust Company ("M&T") entered into a Blocked Account Agreement ("BAA"). (Ex. P-30.) Under the terms of the LSA and BAA, Forest and/or Forest's clients deposited all moneys

3

that Forest's clients paid/owed to Forest into a blocked M&T account. (LSA § 8.11(a).)[6] Also under the terms of the BAA, Defendant had "sole dominion and control" of the blocked account and Forest was unable to withdraw any moneys from the blocked account to pay Plaintiff. (BAA § 4(b).) Rather, M&T "transfer[red]. . . all available funds on deposit in the Blocked Account to the account of [Defendant]." (BAA § 4(a).)

By this process, Defendant received CoFund Priority Collateral that Plaintiff is entitled to under the MPA. Defendant has not turned over these funds to Plaintiff, in breach of the Intercreditor Agreement, which requires Defendant to "hold all funds representing CoFund Priority Collateral in trust for [Plaintiff]." (Intercreditor Agreement § 4.D; *see* Trial Op. at 6–8.) The Intercreditor Agreement is a valid and enforceable contract under applicable Michigan law, and Defendant's breach was not excused. (*See* Trial Op. at 6–10.)

## II. ADDITIONAL FINDINGS OF FACT

At trial, Daniel Cohen, a managing member of Plaintiff and certified public accountant, testified that Defendant "collected a little bit over $9.1 million" in the first three months of 2016 from the blocked account at M&T. (Cohen, T2, 193:1–16.) Of this collected amount, he testified, $1,553,613 represented monies on viable accounts on which Plaintiff was owed $2,119,959 in unpaid participation interest at the end of 2015. (*See* Cohen, T1, 137:16 – 141:12; Cohen, T2, 192:23 – 194:20; Ex. P-67.) Plaintiff argues that it is entitled to this $1,553,613 in damages plus interest. (*See* D.E. 138 ¶¶ 89–98.)

---

[6] LSA § 8.11(a) specifies that Defendant's "dominion of funds," comprising "all payments due [to Forest]" from "all Customers," is a requirement of the loan provided in the LSA. (LSA § 8.11(a) ("The loan shall be on dominion of funds. . . . . [Forest] shall have no right to withdraw any funds from [the blocked account], all of [Forest's] funds therein belong to [Defendant].").) The BAA implements this provision by requiring that "the Blocked Account shall be under the sole dominion and control of [Defendant]." (BAA § 4(b).)

4

Plaintiff's proposed damages amount is based on Ex. P-67, which was created from Defendant's data. Notably, each of the twelve amounts in the "Collected Funds not returned to" column on Ex. P-67 at CoFund-002488 were transferred from the same Forest document that Plaintiff sent to Defendant on December 30, 2015, and that Forest itself sent to Defendant on December 31, 2015. (*See* Ex. P-41 at CoFund-000161; Ex. P-43 at HITACHI010187.)[7] This column represents the sum of moneys that Defendant collected in the first three months of 2016 from the twelve Forest accounts in which Plaintiff had funded participations, all of which were CoFund Priority Collateral.

On January 5, 2016, Toby Dahm, a Senior Vice President at Defendant and Defendant's sole witness, sent a letter to Forest and Plaintiff recognizing the validity of the $2,119,959 amount:

> As reported on [Forest's] financial statements, the total of all funded participations is $5,530,000. Of this amount, approximately $3,410,041 includes the PP&G, ARM and Continuity X accounts. This leaves approximately $2,119,959 as the remaining net participation funds funded by [Plaintiff] to [Forest].

(Ex. P-50 at CoFund-01472; Ex. D-21 at CoFund-01472.) These three amounts—$5,530,000, $3,410,041, and $2,119,959—also appear on the last page of Ex. P-27, which tracked Plaintiff's monthly outstanding participation amounts, advances, and repayments for each Forest client from January 2012 to December 2015. (Ex. P-27 at CoFund-002667; *see* Goldmeier, T1, 25:25 – 27:22.) Notably, Defendant's January 5, 2016, acknowledgment of the $2,119,959 amount as the "net participation funds funded by [Plaintiff] to [Forest]" occurred after Plaintiff and Forest agreed to their last Participation Offer and Acceptance Form on September 17, 2015. (*See* Ex. P-26.) It also occurred after Defendant had received Exs. P-41 and P-43.

---

[7] All the amounts from Exs. P-41 and P-43 were transferred to Ex. P-67, except for $30,000 allocable to Stratus Interoperable. (*See* Cohen, T2, 194:6–20; D.E. 146 at 2.) That $30,000 is not included in Plaintiff's damage claim and was not transferred to Ex. P-67 because (1) Plaintiff claims to have received the funds and (2) Defendant itself received no repayment from the blocked M&T account in connection with Forest's Stratus Interoperable account. (*See* Ex. P-69; D.E. 138 at 34 n.8; D.E. 146 at 2 n.1.)

## III. ADDITIONAL CONCLUSIONS OF LAW

Under Michigan law, the measure of damages on a breach of contract claim is "the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 921–22 (Mich. Ct. App. 2014) (quotation omitted). Michigan courts will award damages if there is a reasonable basis to ascertain them, but not when damages are "conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies." *Id.* at 922 (quotation and citation omitted).

This Court is satisfied that Plaintiff has met its burden to prove its damages as set forth in Ex. P-67 and corroborated by Exs. P-27, P-41, P-43, P-50, P-69, Mr. Cohen's testimony, and the other credible evidence in the record. Defendant contends, based on Mr. Dahm's testimony, that any recovery must be limited by (1) the 50% limitation in the MPA; (2) the limitation to Plaintiff's "pro rata" contribution under the MPA as stated in the Participation Offer and Acceptance Forms; (3) excluding funding for non-factoring transactions such as "security deposits" or "mobilization" loans; (4) excluding accounts that were "improperly collateralized" in September 2015; and (5) excluding proceeds Plaintiff received for identical accounts that were in the Forest bankruptcy. (*See* D.E. 139 at 11–14 ¶¶ 48–60.) Applying these limitations and exclusions, Defendant contends that Plaintiff is entitled at most to $606,209 in principal damages. (*See id.* at 11 ¶ 48.)

As an initial matter, to the extent that Defendant relies primarily on Ex. D-50 to support its proposed damages ceiling of $606,209, (*see* D.E. 145 at 4–9), this Court notes serious questions as to that document's reliability. Defendant's sole witness, Mr. Dahm, described D-50 as "an overview of the Forest [] portfolio during the time period [] from when [Defendant] entered until [Defendant] exited the relationship" with Forest. (Dahm, T2, 317:17–20.) Notably, Mr. Dahm prepared Ex. D-50 in connection with pretrial settlement discussions and not in preparation for

trial. (*See* Dahm, T2, 318:4–9.) The document is based on three Forest borrowing certificates, numbered 1, 161, and 197. (*See* Dahm, T3, 388:25 – 397:6.) However, as Mr. Dahm admitted on cross-examination, the information in Ex. D-50 is inconsistent with the information contained in the underlying borrowing certificates. (*See id.*)[8]

Furthermore, this Court finds no factual or legal basis to support Defendant's proposed reductions. Defendant's briefs focus heavily on the "50%" and "pro rata" limitations contained in the MPA, but the evidence presented at trial did not credibly establish that either limitation is a basis for Defendant to withhold money that Plaintiff did, in fact, advance to Forest. The MPA is intended only to benefit the parties to the agreement (Plaintiff and Forest) and it expressly provides that "[n]othing in the Agreement (whether express or implied) is intended to confer upon any person other than the parties hereto and their permitted assigns any rights or remedies under or by reason of this Agreement." (MPA § 11(e); *see* Goldmeier, T1, 20:2–15.)[9]

Defendant's arguments for excluding "security deposits" and "mobilization" loans are similarly unavailing. In its supplemental brief, Defendant makes passing reference to a $550,000 security deposit. (*See* D.E. 145 at 8.) To the extent that any such money is included in Plaintiff's proposed damages, there is no reason why Defendant is entitled to keep any "security deposits" that were advanced by Plaintiff to Forest and repaid into the blocked account. Neither the MPA

---

[8] For example, (1) borrowing certificate 1 lists Plaintiff's participation as $1,513,614.54, but Ex. D-50 represents the interest as $1,066,808.00; (2) borrowing certificate 161 lists Plaintiff's participation as $1,143,625.38, but Ex. D-50 represents the interest as $1,034,532.00; and (3) borrowing certificate 197 lists Plaintiff's participation as $976,063.03, but Ex. D-50 represents the interest as $606,209.00. (*See* Dahm, T3, 388:25 – 397:6; *see also* D.E. 146 at 10.)

[9] Furthermore, the MPA recognizes that "fluctuations in the volume of Factored Accounts . . . may cause [Plaintiff]'s Investment in the Transaction to exceed its Maximum Permitted Investment from time to time." (MPA § 3(b).) Although MPA § 3(a) states that "[Plaintiff]'s Investment in a Transaction as of any Settlement Date shall not exceed fifty percent (50%) of the aggregate principal amount of Advances to the Client then outstanding," Defendant offered no evidence as to Plaintiff's investment as of any Settlement Date (the last business day of each month, as defined by MPA § 1), and how it would be reduced by the 50% limitation.

nor the Intercreditor Agreement limited the purposes for which Plaintiff was entitled to advance funds to Forest and receive participation interests.

Defendant also points to "five accounts that were improperly collateralized in September 2015, long after [Plaintiff] did any funding of those accounts," and argues that these accounts should be excluded from any damages. (D.E. 145 at 8–9.) However, this Court is satisfied with Lee Goldmeier's testimony that these participations were offered and accepted in accordance with the MPA and in fact funded with Plaintiff's Reserve Funds under the agreement. (*See* Goldmeier, T1, 45:25 – 50:19; Exs. P-22 to P-26, P-35; MPA § 3(d).)

Finally, Defendant argues for unspecified reductions based on the bankruptcy sale of eight of Forest's accounts in which Plaintiff funded participations. (*See* D.E. 145 at 6.)[10] Of the $624,180.75 that Plaintiff received as a result of the March 15, 2019, consent order approving the settlement of the adversary proceeding in the United States Bankruptcy Court for the District of Maryland, approximately $580,000 represented moneys that came into the bankruptcy estate from People's Power & Gas ("PP&G"). (*See* Ex. D-11 at 12; Goldmeier, T1, 103:23 – 104:4; Leppert, T2, 226:12 – 229:1.)[11] Defendant's own witness testified that money from Forest's PP&G account did not end up in the M&T blocked account. (*See* Dahm, T3, 371:25 – 372:12.) The source of the remaining $44,180.75 could not be established and Plaintiff deducted it accordingly from its proposed damages. (*See* D.E. 138 ¶ 97(f).) There is therefore no overlap between Plaintiff's recovery in the bankruptcy proceedings and Plaintiff's proposed damages in the instant case.

---

[10] As this Court previously summarized, certain junior creditors commenced bankruptcy proceedings against Forest on March 24, 2016. (Trial Op. at 6.) Forest commenced an adversary case on July 7, 2016, to determine the existence, validity, and priority of various creditors' rights to the assets of the bankruptcy estate. (*Id.*) The adversary case settled on March 15, 2019, with Plaintiff and Defendant both receiving proceeds. (*Id.*)

[11] This amount is further confirmed by the Amended Motion to Approve the Settlement that Forest's bankruptcy counsel filed in the adversary proceeding on December 27, 2018. *See Forest Capital, LLC v. Hitachi Cap. Am. Corp.*, Adv. No. 16-326 (D. Md. Bankr.), D.E. 151 ¶ 21; *see also* FED. R. EVID. 201(d) (stating that a court may take judicial notice of adjudicative facts at any stage of the proceeding).

In summary, this Court finds that Plaintiff's proposed damages are based on the credible evidence presented at trial, and Defendant's proposed reductions are not. This Court also finds that good cause exists to award prejudgment interest at the rate set forth in New Jersey Court Rule 4:42-11(a)(iii),[12, 13] and will therefore adopt Plaintiff's proposed minimum damages.

## IV. CONCLUSION

For the reasons set forth above, this Court finds that Defendant is liable to Plaintiff for $1,553,613 in principal damages, plus prejudgment interest and costs. Plaintiff may file a Bill of Costs and Disbursements with the Clerk of Court within 30 days, according to Local Civil Rule 54.1. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Hon. Leda D. Wettre, U.S.M.J.
        Parties

---

[12] Although this Court applied Michigan law to decide Plaintiff's claim, in accordance with the Intercreditor Agreement, (*see* Trial Op. at 6), New Jersey law applies to the award of prejudgment interest. *See Gleason v. Norwest Mortg., Inc.*, 253 F. App'x 198, 203–04 (3d Cir. 2007) (citations omitted) (noting that federal courts sitting in diversity must apply the law of the forum state to questions of process). Under New Jersey law, "prejudgment interest in contract cases[] is governed by equitable principles." *Id.* at 204 (citing *Cty. of Essex v. First Union Nat. Bank*, 891 A.2d 600, 609 (N.J. 2006)). New Jersey Court Rule 4:42–11(a) governs postjudgment interest and "may serve as an appropriate benchmark [for prejudgment interest] in contract cases." *Id.* (citing *DialAmerica Mktg., Inc. v. KeySpan Energy Corp.*, 865 A.2d 728, 732 (N.J. Super. Ct. App. Div. 2005)). In awarding prejudgment interest in a contract case, "the basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *Cty. of Essex*, 891 A.2d at 608 (quotation and brackets omitted). That is precisely the case here, and the awarded amount will not "constitute a windfall" for Plaintiff, as Defendant contends. (D.E. 145 at 10.)

[13] For $1,368,027 of Plaintiff's principal damages, interest should run from December 29, 2014, when Defendant began to exercise exclusive dominion and control over the funds pursuant to the BAA. (*See* D.E. 138 ¶¶ 96, 97(a).) For the remaining $185,586, allocable to the Atlantic Coast Energy, DiGeronimo, Global Dwelling, and Sysgen accounts, interest should run beginning on September 17, 2015, in accordance with the Participation Offer and Acceptance Forms for those accounts. (*See* D.E. 138 ¶ 97(b) n.11; Exs. P-22 to P-24, P-26.)